

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No. 3:26CR 51 |
| v. | 18 U.S.C. § 1791(a)(1), (b)(1) Providing Contraband in Prison (Count 1) |
| JASMIN COLEMAN, | |
| *Defendant.* | 18 U.S.C. § 201(b)(2) Public Official Accepting a Bribe (Count 2) |
| | Forfeiture Allegation |

## CRIMINAL INFORMATION

THE UNITED STATES ATTORNEY CHARGES THAT:

### GENERAL ALLEGATIONS

At all times material to this Information, unless otherwise stated:

1.     The Federal Correctional Complex (FCC) in Petersburg, Virginia is a federal correctional institution administered by the United States Bureau of Prisons (BOP), a component of the United States Department of Justice, housing male inmates. FCC Petersburg is located within the Eastern District of Virginia.

2.     From on or about January 12, 2025, and continuing through on or about September 23, 2025, defendant JASMIN COLEMAN (hereafter, COLEMAN) was employed by the BOP as a Correctional Officer at FCC Petersburg. COLEMAN worked at the Complex's Medium Security Institution (FCI Petersburg – Medium).

3.     COLEMAN's duties as a Correctional Officer included the responsibility for ensuring the supervision, care, and security of federal inmates. During her time as a correctional officer at FCC Petersburg, COLEMAN worked primarily as a Housing Unit Officer and within

FCI Petersburg's medical unit. At all relevant times, COLEMAN was a public official as defined in Title 18 U.S.C. Section 201(A)(1).

4. Inmate 1 and Inmate 2 were federal prisoners incarcerated at FCC Petersburg; specifically, within FCI Petersburg Medium.

5. Title 18, United States Code, Section 1791 and BOP regulations proscribe inmates' possession of "prohibited objects," a designation that includes:

    a. Phones

    b. Tobacco products

    c. Synthetic cannabinoid products (including "K2," a synthetic marijuana)

    d. Marijuana, a Schedule I controlled substance as classified by the Drug Enforcement Administration (DEA)

    e. Methamphetamine, a Schedule II controlled substance as classified by the DEA

    f. Narcotic drugs, to include Suboxone (buprenorphine/naloxone), a Schedule III controlled substance as classified by the DEA

6. COLEMAN's duties as a BOP employee included the enforcement of federal law and BOP regulations pertaining to inmates' possession of prohibited objects.

7. CashApp and Apple Pay are digital platforms that provide their users the ability to complete peer-to-peer monetary transfers between the users' bank accounts or online wallets.

**COUNT ONE**
(Providing Contraband in Prison)

8. The preceding paragraphs are incorporated by reference.

### A. The Smuggling Schemes

9. Beginning in or around May of 2025, COLEMAN entered into a relationship with Inmate 1. COLEMAN and Inmate 1 would communicate and interact both in-person and through

2

communications between COLEMAN's personal cell phone (ending in -4841) and contraband cell phones possessed by Inmate 1, including a cell phone with a phone number ending in -0537.

10. For example, between August 15 and August 28 of 2025, COLEMAN and Inmate 1 exchanged more than 2,700 text messages between COLEMAN's personal phone and Inmate 1's contraband phone ending in -0537. Those messages included exchanges of photographs and references to COLEMAN's and Inmate 1's relationship. Inmate 1 saved COLEMAN's number in his contraband cell phone under the contact name "Ole Girl," and addressed COLEMAN in his messages as "love" and "baby;" COLEMAN addressed Inmate 1 in their text message exchanges as "my King" and "baby," and referred to herself in these messages as Inmate 1's "amazing wife" who "loves [Inmate 1] unconditionally."

11. COLEMAN agreed to smuggle various and sundry prohibited items into FCC Petersburg for Inmate 1, to include cigarettes, marijuana wax, cell phones, paper impregnated with K2, and suboxone strips. Inmate 1 facilitated the delivery of these materials to COLEMAN by directing certain of Inmate 1's (non-incarcerated) associates to acquire those items and then coordinating a rendezvous between COLEMAN and his associates at which COLEMAN would take possession of the items.

12. COLEMAN, following instructions provided to her Inmate 1, would then personally re-package those items into bags that COLEMAN brought to work with her at FCC Petersburg; smuggle those concealed items through FCC Petersburg's security checkpoints; bring those items to her office in an FCI Petersburg Medium housing unit; and distribute those prohibited items to Inmate 1 and other inmates designated by Inmate 1.

13. COLEMAN agreed to accept monetary payments from Inmate 1 in exchange for smuggling these prohibited items into FCC Petersburg, fully knowing and understanding that her

3

conduct was in violation of federal law and BOP regulations. COLEMAN received these monetary payments from Inmate 1 via Apple Pay electronic transfers and occasionally in cash payments from Inmate 1.

14.    Separately, and unrelated to COLEMAN's relationship and smuggling scheme with Inmate 1, COLEMAN also developed a business relationship with Inmate 2 that entailed COLEMAN's acceptance of monetary payments from Inmate 2 in exchange for COLEMAN agreeing to smuggle prohibited items into FCC Petersburg for delivery to Inmate 2 and inmates designated by Inmate 2.

15.    COLEMAN's relationship with Inmate 2 began in or around May of 2025. COLEMAN communicated with Inmate 2 both in-person and via messages exchanged via an encrypted messaging application between COLEMAN's personal phone and a contraband phone utilized by Inmate 2.

16.    COLEMAN agreed to accept packages mailed to her by Inmate 2's (non-incarcerated) associates. Using the United States Mail, Inmate 2's associates facilitated the delivery of numerous packages to a Post Office Box registered to COLEMAN at a United States Post Office in Colonial Heights, Virginia, within the Eastern District of Virginia. These packages contained numerous different types of materials classified as prohibited items by the BOP, to include cigarettes, marijuana wax, Suboxone strips, and paper impregnated with K-2.

17.    COLEMAN would likewise re-package these materials into bags that COLEMAN would bring to FCC Petersburg; smuggle those items through FCC Petersburg's security checkpoints; bring those items to her office in an FCI Petersburg Medium housing unit; and distribute those prohibited items to Inmate 2 and other inmates designated by Inmate 2.

4

18.    COLEMAN accepted monetary payments from Inmate 2 for her smuggling activities, which Inmate 2 facilitated by way of Apple Pay transfers to COLEMAN from Apple Pay accounts belonging to various of Inmate 2's (non-incarcerated) associates.

19.    In total, between May and September of 2025, COLEMAN accepted more than two dozen CashApp and Apple Pay payments from Inmate 1 and Inmate 2 in the course of her smuggling activities; these monetary transfers totaled $66,520 in the aggregate.

**B.  Exposure of the Smuggling Schemes**

20.    In early September 2025, FCC Petersburg security personnel conducted a search of Inmate 1's cell at FCI Petersburg Medium.  That search uncovered a significant amount of prohibited items, to include cigarettes, marijuana, and contraband cell phones.  A review of one of the contraband cell phones recovered from Inmate 1 established that Inmate 1 was the primary user of that cell phone (-0537); further review confirmed that the -0537 phone was in regular contact with a phone number registered to a BOP employee: COLEMAN's -4841 phone.

21.    Federal investigators subsequently learned that a package had been delivered to COLEMAN's Post Office Box at the Colonial Heights Post Office, addressed to a non-existent recipient and with a return address to a non-existent address.  Investigators obtained a search warrant for that package.

22.    COLEMAN arrived at the Colonial Heights Post Office to retrieve that package on September 12, 2025.  When COLEMAN arrived and collected the package, federal agents confronted COLEMAN and explained to COLEMAN that they had a search warrant for the package.  COLEMAN provided consent to the agents to search the package.

23.    The package was found to contain various controlled substances, to include: 211 grams of methamphetamine, 48 grams of cocaine-impregnated paper, two packages containing

(respective package weights) 184 and 117 grams of marijuana wax, 132 grams of Suboxone strips, and 70 grams of K-2 impregnated paper.

24. The United States does not possess evidence establishing that COLEMAN knew and understood that this package contained methamphetamine, or that COLEMAN did not understand this package to contain the types of contraband that COLEMAN had previously received, re-packaged, and smuggled into FCI Petersburg (that is, cigarettes, marijuana wax, Suboxone strips, and paper impregnated with K-2).

25. COLEMAN admitted to investigators that she also had additional packages in the trunk of her vehicle, which she had received earlier from an associate of Inmate 1; COLEMAN provided investigators with consent to search those packages, which consisted of two black duffel bags full of cigarettes. COLEMAN later provided investigators with two more packages that she had recently received from Inmate 2 at COLEMAN's Post Office Box; a consensual search of these packages located an additional 183 grams of suspected K-2 impregnated paper.

## C. Statutory Language

26. Between in or around May of 2025, through in or around September of 2025, in the Eastern District of Virginia, the defendant, JASMIN COLEMAN, contrary to federal law and Bureau of Prisons regulations, provided and attempted to provide prohibited objects, to wit, marijuana, narcotic drugs, phones, and other objects that threaten the order, discipline, and security of FCC Petersburg and the life, health, and safety of inmates confined therein, to Inmate 1 and Inmate 2, inmates of Federal Correctional Complex Petersburg, a Federal prison, institution, and facility in which persons are held in custody by direction of and pursuant to a contract and agreement with the Attorney General.

(All in violation of Title 18, United States Code, Section 1791(a)(1), (b)(1)).

6

## COUNT TWO
### (Public Official Accepting a Bribe)

27.     The preceding paragraphs are incorporated by reference.

28.     Beginning in or around May of 2025 and continuing through in or around September of 2025, the exact dates being unknown, in the Eastern District of Virginia and within the jurisdiction of the Court, as well as elsewhere, the defendant, JASMIN COLEMAN, a public official, directly and indirectly did corruptly demand, seek, receive, and accept, and agree to receive and accept, personally, something of value in return for being induced to do or omit to do an act in violation of her official duties; that is, to accept monetary payment in exchange for agreeing to smuggle and to attempt to smuggle prohibited objects into FCC Petersburg and providing those prohibited items to inmates confined at FCC Petersburg.

(In violation of Title 18, United States Code, Section 201(b)(2)).

## FORFEITURE NOTICE

Pursuant to Rule 32.2(a) Fed. R. Crim. P., the defendant, JASMIN COLEMAN, is hereby notified that upon conviction of the offense alleged in Count Two of this Criminal Information, she shall forfeit to the United States her interest in any property, real or personal, that constitutes or is derived from proceeds traceable to the offense.

(In accordance with Title 18, United States Code, Section 981(a)(1)(c) as incorporated by 28 U.S.C. § 2461(c).)

TODD W. BLANCHE
Deputy Attorney General

By:     _____
Thomas A. Garnett
Assistant United States Attorney